UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SHEILA MARINO,<br><br>Plaintiff,<br><br>v.<br><br>FARMERS NEW WORLD LIFE INSURANCE COMPANY,<br><br>Defendant. | CASE NO. 2:25-cv-02200-JNW<br><br>ORDER DENYING DEFENDANT'S MOTION TO DISMISS |

## 1. INTRODUCTION

This matter comes before the Court on Defendant Farmers New World Life Insurance Company's ("FNWL") motion to dismiss Plaintiff Sheila Marino's putative class action involving flexible universal life insurance. Dkt. No. 10. Marino's claims turn on how FNWL has used the discretion her policy reserves to it—over what FNWL charges for insurance and what it pays in interest. At this early stage, her reading of the policy is reasonable, and her allegations are plausible. Having considered the motion, the response, the reply, all supporting materials, and the relevant law, the Court DENIES the motion.

## 2. BACKGROUND

In 1988, Marino[1] purchased an FNWL flexible universal life insurance policy with a $100,000 death benefit (the "Policy"). Dkt. No. 1-2 ¶ 8; *id.* at 37. Universal life insurance operates differently from traditional insurance because there is no monthly premium fixed by the insurer. Instead, policyholders make deposits into an interest-bearing accumulation account from which the insurer deducts monthly payments to cover the cost of insurance. *See id.* ¶ 10; *id.* at 22, 27.

Marino's policy follows this general framework. Instead of fixed premiums, the cost of insurance is paid through monthly deductions from Marino's accumulation account. *Id.* ¶ 10. The monthly deductions include the risk charge and the monthly administration charge. *Id.* ¶ 13. The Policy defines each charge by what it pays for. The risk charge is "[t]he portion of the monthly deduction which pays for the risk of loss." *Id.* ¶¶ 15, 17; *id.* at 22. The monthly administration charge, by contrast, is a deduction "which covers the cost of managing the policy." *Id.* at 22. To determine the risk charge, FNWL takes "the monthly risk rate per $1000 of risk at your attained age, times the number of thousands of Risk Insurance Amount. The Risk Insurance Amount is the difference between the current death benefit and the accumulation account balance[.]" *Id.* ¶ 14; *id.* at 28. FNWL cannot use a risk rate greater than the "Guaranteed Maximum Monthly Risk Rates" set forth in the Policy. *Id.* at 28.

---

[1] The Complaint refers to Plaintiff as Sheila Marino. But the Policy lists Sheila Clayton as the applicant and insured. Dkt. No. 1-2 at 20, 37, 41. Plaintiff does not explain this discrepancy. The Court refers to Plaintiff as Marino following the Complaint.

**GUARANTEED MAXIMUM MONTHLY RISK RATES**
Per $1000 of Risk Insurance Amount

| Attained Age | Risk Rate | Attained Age | Risk Rate |
|---|---|---|---|
| 16 | .11568 | 56 | .97839 |
| 17 | .12068 | 57 | 1.03506 |
| 18 | .12506 | 58 | 1.09238 |
| 19 | .12942 | 59 | 1.15536 |
| 20 | .13257 | 60 | 1.23033 |
| 21 | .13506 | 61 | 1.32428 |
| 22 | .13757 | 62 | 1.44350 |
| 23 | .14070 | 63 | 1.58813 |
| 24 | .14382 | 64 | 1.75065 |
| 25 | .14696 | 65 | 1.92474 |
| 26 | .15071 | 66 | 2.10483 |
| 27 | .15509 | 67 | 2.28515 |
| 28 | .16010 | 68 | 2.47139 |
| 29 | .16572 | 69 | 2.67941 |
| 30 | .17199 | 70 | 2.92596 |
| 31 | .17825 | 71 | 3.22970 |
| 32 | .18449 | 72 | 3.60579 |
| 33 | .19265 | 73 | 4.05872 |
| 34 | .20202 | 74 | 4.58220 |
| 35 | .21327 | 75 | 5.16662 |
| 36 | .22832 | 76 | 5.80307 |
| 37 | .24584 | 77 | 6.48690 |
| 38 | .26651 | 78 | 7.22841 |
| 39 | .29030 | 79 | 8.05473 |
| 40 | .31661 | 80 | 8.99927 |
| 41 | .34479 | 81 | 10.09433 |
| 42 | .37301 | 82 | 11.36799 |
| 43 | .40119 | 83 | 12.82310 |
| 44 | .43065 | 84 | 14.44317 |
| 45 | .46076 | 85 | 16.21640 |
| 46 | .49148 | 86 | 18.13632 |
| 47 | .52473 | 87 | 20.20350 |
| 48 | .56111 | 88 | 22.42844 |
| 49 | .60066 | 89 | 24.83415 |
| 50 | .64332 | 90 | 27.45962 |
| 51 | .68982 | 91 | 30.37437 |
| 52 | .74256 | 92 | 33.70544 |
| 53 | .79976 | 93 | 37.73307 |
| 54 | .85886 | 94 | 43.10412 |
| 55 | .91923 | | |

Dkt. No. 1-2 at 31. Meanwhile, the balance of Marino's accumulation account accrues interest. *Id.* ¶ 9. Under the Policy, "[t]he guaranteed minimum rate used to calculate interest on the accumulation account is 4.5% per year, compounded annually." *Id.* ¶ 26; *id.* at 28. FNWL has discretion to "use rates which are higher than the guaranteed minimum rate," and those "rates are subject to change at any time[.]" *Id.* at 28.

The Policy also provides "Cash Value Options" through which Marino can cancel the Policy under certain conditions in exchange for the "cash value," which

the Policy defines as the accumulation account balance minus the surrender charge or outstanding loan, if any. *Id.* ¶¶ 9–11; *id.* at 28–29. According to the Policy's "Method of Calculation," "[m]inimum cash values are based on the Commissioners 1980 Standard Ordinary Table of Mortality, age last birthday with [4.5 percent] interest, compounded annually[.]" *Id.* ¶ 16; *id.* at 28.

Marino brings three claims: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) violation of the Washington Consumer Protection Act (CPA). *Id.* ¶¶ 42–64. Marino alleges that FNWL inflated the cost of insurance by loading the risk charge with non-mortality factors and by failing to reduce it as mortality rates improved over time. *Id.* ¶¶ 22–24. Marino further alleges that FNWL credited only the guaranteed minimum interest rate to her accumulation account even though it had discretion to pay more. *Id.* ¶¶ 27–29. The parties call these allegations the overcharge theory and the underpayment of interest theory, respectively.

On October 1, 2025, Marino filed her class action complaint in King County Superior Court. Dkt. No. 1-2 at 2. FNWL removed the action to this Court under the Class Action Fairness Act of 2005 (CAFA). Dkt. No. 1. FNWL now asks the Court to dismiss Marino's complaint with prejudice for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 10.

## 3. LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). The plausibility standard is less than probability, "but it asks for more than a sheer possibility" that a defendant did something wrong. *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). In other words, a plaintiff must plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

When considering a motion to dismiss, the Court accepts factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Lund v. Cowan*, 5 F.4th 964, 968 (9th Cir. 2021). But courts "do not assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011). Thus, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Id.* (internal quotation marks omitted).

## 4. DISCUSSION

### 4.1 Washington state law governs Marino's claims.

FNWL argues Illinois law governs Marino's contract claims. Dkt. No. 10 at 13–14. Marino argues Washington law applies. Dkt. No. 12 at 9–10. In resolving that dispute, "[a] federal court sitting in diversity ordinarily must follow the choice-

of-law rules of the State in which it sits." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 65 (2013). "This applies to actions brought under the Class Action Fairness Act as well, since CAFA is based upon diversity jurisdiction." *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1168 (N.D. Cal. 2016) (citation modified). Accordingly, this Court applies Washington choice-of-law rules.

"Under Washington State's choice of law rules, Washington law presumptively applies" unless it conflicts with another state's law or there is an effective choice of law by the parties to apply another state's law. *Balmuccino, LLC v. Starbucks Corp.*, No. 2:22-CV-01501 JHC, 2023 WL 4761447, at *3 (W.D. Wash. July 26, 2023), *aff'd*, No. 23-35561, 2024 WL 4262805 (9th Cir. Sept. 23, 2024); *see also Woodward v. Taylor*, 366 P.3d 432, 434 (Wash. 2016) (Washington law "presumptively applies" to cases filed in this state); *Burnside v. Simpson Paper Co.*, 864 P.2d 937, 942 (Wash. 1994) (Washington trial court did not err in applying Washington law when a party failed to show a conflict between Washington's and another state's laws because "[a]bsent such a showing, the forum may apply its own law").

**4.1.1 An actual conflict of law exists for one of Marino's claims.**

As a first step, the Court must determine whether an actual conflict exists such that "the outcome of an issue is different depending on which state's law applies." *Pope Res. LP v. Certain Underwriters at Lloyd's, London*, 494 P.3d 1076, 1084 (Wash. Ct. App. 2021).

FNWL argues that Washington and Illinois law conflict because Illinois does not recognize an independent claim for breach of the implied covenant of good faith and fair dealing. Dkt. No. 10 at 13 n.4, 14; Dkt. No. 13 at 8 n.2. FNWL is right about Illinois law—it "does not recognize independent claims based on breaches of any implied duties of good faith." *Parson v. Allstate Ins. Co.*, No. 24-CV-1493, 2026 WL 811303, at *5 (N.D. Ill. Mar. 23, 2026) (quoting *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1105–06 (7th Cir. 1997)). "Under Illinois law, the implied covenant of good faith and fair dealing is imputed into every contract, 'but a breach of good faith and fair dealing does not create an independent cause of action separate from the breach of contract claim.'" *Schwartz v. Opportunity Int'l, Inc.*, No. 14-CV-5775, 2015 WL 300591, at *3 (N.D. Ill. Jan. 21, 2015) (quoting *Cobb-Alvarez v. Union Pac. Corp.,* 962 F. Supp. 1049, 1055 (N.D. Ill. 1997)). If a plaintiff's allegations are redundant to those supporting the breach of contract claim, the implied covenant claim is subject to dismissal under Illinois law. *See, e.g.*, *Parson*, 2026 WL 811303, at *5.

Washington law, by contrast, recognizes a claim for breach of the implied covenant of good faith and fair dealing, *Retsel Corp. v. Expedia, Inc.,* No. C25-1033 TSZ, 2026 WL 2168599, at *3 (W.D. Wash. July 28, 2026), and the duty can be breached even when no express contract term is breached, *Rekhter v. State, Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1041 (Wash. 2014).

The two States' laws thus lead to different results on at least one question: whether Marino's good-faith claim may proceed on its own. Under Illinois law, it would fold into her breach of contract claim; under Washington law, it may stand as

a separate claim. That is enough for an actual conflict. *See Pope Res. LP*, 494 P.3d at 1084; *cf. Parson*, 2026 WL 811303, at *5 (treating a similar difference in state law as potentially outcome determinative).

FNWL identifies no other conflict that bears on this motion. It observes that state contract law varies in general ways, "including with respect to the length of the applicable statute of limitations, forms of recovery, and available contract defenses," but it does not explain how any of those differences affects the questions presented here. Dkt. No. 13 at 8 n.2 (quoting *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 635 (W.D. Wash. 2011)). So the presumption that Washington law applies holds for Marino's remaining claims. *See Burnside*, 864 P.2d at 942. The rest of this analysis concerns only her implied covenant claim.

#### 4.1.2 The Policy does not contain an effective choice-of-law clause.

"Once an actual conflict is established, the next step in the conflict of law analysis depends on whether the parties have contracted for a specific state's law to apply." *Pope Res. LP*, 494 P.3d at 1084. FNWL points to the Policy's "Conformity to State Laws" provision, which states: "[t]his policy is subject to the laws of the state in which it is delivered. Any terms which are in conflict with these laws are amended to conform." Dkt. No. 1-2 at 23. FNWL argues that because it delivered the Policy in Illinois, this provision selects Illinois law. Dkt. No. 10 at 13. Marino responds that it is "a standard 'conformity-to-state-law' savings clause, not a choice-of-law provision." Dkt. No. 12 at 9. The Court agrees with Marino.

"'A conformity clause has the effect of excising a provision of an insurance policy that conflicts with or is voided by state law and replacing the provision with the prevailing state statute or judicial rule of law.'" *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132–33 (2d Cir. 2018) (quoting *Lawrimore v. Progressive Direct Ins. Co.*, 627 F. App'x 253, 254 (4th Cir. 2016)). It keeps a policy's terms lawful. It doesn't choose the law that governs disputes over them. In *AEI Life*, the Second Circuit held that language much like the Policy's—"[t]his certificate is subject to the laws of the state where the application was signed. If any part of the certificate does not comply with the law, it will be treated by us as if it did"—created a conformity clause and nothing more. *Id.* at 132–35. The Second Circuit gave two reasons. First, it would expect a clause that also chose the governing law to name the chosen State, and that clause named none. *Id*. at 133. Second, "in making the certificate 'subject to' such laws, the clause suggests only conformity to such laws." *Id*. The Eighth Circuit recently reached the same conclusion about the same kind of clause: "The problem with [the plaintiff's] argument is that it construes the Policy's 'CONFORMITY WITH LAWS' clause as a choice of law clause. But that provision is not a choice of law clause. It is, as it states, a conformity with laws clause." *Wells Fargo Bank N.A. v. Ameritas Life Ins. Corp.*, 183 F.4th 1056, 1062–63 (8th Cir. 2026) (applying Nebraska choice-of-law rules). That is how most courts have read clauses like this one. *See AEI Life*, 892 F.3d at 134 (collecting cases); *DeCesare v. Lincoln Benefit Life Co.*, 852 A.2d 474, 482 (R.I. 2004); *Ins. Co. of N. Am. v. San Juan Excursions, Inc.*, No. C05-2017Z, 2006 WL 2635635, at *4 (W.D. Wash. Sept. 12, 2006) (calling it a "mistake[ ]" to treat such

language as a choice-of-law clause); *Nat'l Sur. Corp. v. Mack*, No. CV 15-35-BLG-SPW, 2015 WL 8779995, at *2 (D. Mont. Dec. 15, 2015).

FNWL's contrary authority does not change the analysis. In *Schnall v. AT&T Wireless Services, Inc.*, 259 P.3d 129 (Wash. 2011), the Washington Supreme Court enforced choice-of-law provisions in consumer agreements, among them one making the agreement "subject to applicable federal laws, federal or state tariffs, if any, and the laws of the state associated with the [phone] Number." Brief of Respondent and Cross-Appellant, 2006 WL 6286929, at *17 (Aug. 12, 2006); *see Schnall*, 259 P.3d at 132–33. The court reasoned that the customer "in effect" chose the governing law by choosing an area code. *Schnall*, 259 P.3d at 132. No one argued those provisions were conformity clauses, and nothing in them suggested as much. The Policy's provision is different in both respects. It sits under the heading "Conformity to State Laws," and its second sentence does a conformity clause's work: "Any terms which are in conflict with these laws are amended to conform." Dkt. No. 1-2 at 23. Reading the first sentence as a choice-of-law clause would ignore the rest of the provision. *See Hall v. State Farm Mut. Auto. Ins. Co.*, 135 P.3d 941, 944 (Wash. Ct. App. 2006) ("[The court] must consider the policy as a whole[.]"); *AEI Life*, 892 F.3d at 133 n.8 (distinguishing a "subject to" clause that named the chosen jurisdiction and carried no conformity heading).

The Policy thus contains no effective choice-of-law provision.

#### 4.1.3 Washington, not Illinois, has the more significant relationship to Marino's implied covenant claim.

Because the parties have not contracted for a choice-of-law provision, the Court next applies the "most significant relationship test." *Pope Res. LP*, 494 P.3d at 1084. Factors include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* (quoting Restatement (Second) of Conflict of Laws § 188 (1971)).

FNWL argues the factors weigh in its favor because Illinois is Marino's "state of residence, and the place where she contracted with FNWL, where she paid her premiums, and where all notices were sent." Dkt. No. 13 at 7. Marino argues Washington has a substantial interest in the dispute because FNWL is a Washington corporation headquartered in Washington, the "Policy form appears to have been drafted and issued from Washington, and [Marino] brings a Washington CPA claim to address FNWL's conduct as a Washington-based insurer." Dkt. No. 12 at 10. FNWL does not respond to that contention.

The contacts are a wash. The application was signed in Yorkville, Illinois. Dkt. No. 1-2 at 41. But "[s]tanding alone, the place of contracting is a relatively insignificant contact," *Raab v. Nu Skin Enters., Inc.*, 536 P.3d 695, 716 (Wash. Ct. App. 2023), *aff'd*, 565 P.3d 895 (Wash. 2025), and there is no evidence of a negotiation anywhere. Marino performed in Illinois, where she paid premiums and received notices; FNWL performed from Washington. The contract has no physical

situs. *See id.* ("The situs of the 'subject matter of the contract' is a factor when the contract deals with a specific physical thing or protects against a localized risk."). And the parties' domiciles cancel out—Marino is a resident of Illinois, Dkt. No. 1-2 ¶ 3, and FNWL is headquartered in Washington, *id.* ¶ 4.

But the "contacts per se are not what is important; it is their 'relative importance with respect to the particular issue' in the case" that controls. *Raab*, 536 P.3d at 717 (quoting Restatement § 188(2)). The particular issue here is whether FNWL, a Washington insurer, owes a duty of good faith when it exercises the discretion its standard-form policy reserves to it. Washington has a strong interest in that question. It has "a 'vital interest in regulating . . . business within its territorial boundaries so as to insure fair business practices.'" *Id.* (quoting *Granite Equip. Leasing Corp. v. Hutton*, 525 P.2d 223 (Wash. 1974)). And Marino brings this suit to address FNWL's conduct as a Washington-based insurer. Weighing the contacts in light of these policy considerations, the Court finds that Washington has the most significant relationship to the disputed issue—whether Marino states a claim for breach of the implied covenant of good faith and fair dealing.

Washington law therefore governs every claim. It governs the implied covenant claim because Washington has the most significant relationship to that claim. It governs the other claims because FNWL has shown no conflict.

**4.2 Marino states a plausible breach of contract claim.**

"Insurance policies are to be construed as contracts, and interpretation is a matter of law." *Wash. Pub. Util. Dists.' Utils. Sys. v. Pub. Util. Dist. No. 1 of*

*Clallam Cnty.*, 771 P.2d 701, 706 (Wash. 1989). Courts give the policy "a fair, reasonable and sensible construction as would be given to the contract by the average person purchasing insurance." *Providence Health & Servs. v. Certain Underwriters at Lloyd's London*, 440 F. Supp. 3d 1223, 1228 (W.D. Wash. 2020) (citations omitted). The policy must be viewed as a whole; "a phrase cannot be interpreted in isolation." *Allstate Ins. Co. v. Peasley*, 932 P.2d 1244, 1246 (Wash. 1997).

"A provision is ambiguous if it is 'fairly susceptible to two different, reasonable interpretations.'" *Whitman v. State Farm Ins. Co.*, No. 3:19-CV-06025-BJR, 2022 WL 4081916, at *3 (W.D. Wash. Sept. 6, 2022) (quoting 932 P.2d 1244*Wm. Dickson Co. v. Pierce Cnty*, 128 Wash. App. 488, 493–94 (2005)). Ambiguous terms are construed against the drafter in favor of the insured. *Mercer Place Condo. Ass'n v. State Farm Fire & Cas. Co.*, 17 P.3d 626, 628 (Wash. Ct. App. 2000). "Resolving the ambiguity in favor of the insured means that the Court adopts the reasonable interpretation offered by the insured." *Whitman*, 2022 WL 4081916, at *3 (citation modified). But a disputed provision "will not be given a forced or constrained construction that would lead to an absurd conclusion." *Mid-Century Ins. Co. v. Zanco*, 456 F. Supp. 3d 1213, 1224 (E.D. Wash. 2020).

The Court finds that Marino states a plausible breach of contract claim by alleging that FNWL overcharged for the cost of insurance. Marino argues that a lay policyholder would reasonably understand the risk charge to be based exclusively on mortality rates because the Policy defines it as the portion of the monthly deduction that pays "for the risk of loss, i.e., death," calculated by a risk rate "at

your attained age." Dkt. No. 1-2 ¶ 17; *id.* at 22, 28. Marino claims FNWL breached the Policy by adding non-mortality factors to the risk charge and by failing to reduce the cost of insurance even though mortality rates have improved over time.

FNWL argues it retained discretion to set the monthly risk charge so long as it did not use a risk rate greater than the guaranteed monthly rate. FNWL further argues Marino's interpretation is unreasonable because the Policy does not state that the risk charge *only* pays for the risk of loss. FNWL cites cases in which courts have found the plaintiff's interpretation of a cost-of-insurance provision unreasonable.

For example, in *Norem v. Lincoln Benefit Life Co.,* the Seventh Circuit held that an insurer could consider factors beyond those listed in the policy when setting its cost-of-insurance rate, even though the policy stated that "[t]he cost of insurance rate is based on the insured's sex, issue age, policy year, and payment class." 737 F.3d 1145, 1147, 1151–52 (7th Cir. 2013) (applying Illinois law)*; see also Anderson v. Wilco Life Ins. Co.*, 17 F.4th 1339, 1346 (11th Cir. 2021) (applying Georgia law) (holding that a universal life insurance policy unambiguously gave the insurer discretion to set the insured's monthly rate where the policy said that the monthly rate "will be determined by the [insurer]" and "will not be greater than the guaranteed monthly rates which are listed on the Policy Data Page."). FNWL also cites *Whitman*, in which a court in this District examined a policy that stated, "rates for each policy year are based on the Insured's age . . . , sex, and applicable rate class," and found the plaintiff's interpretation—that the cost of insurance should be calculated based on only mortality factors—"does not account for the term

'applicable rate class' or the broader context of the Policy and is not reasonable." 2022 WL 4081916, at *6.

Although *Norem, Anderson,* and *Whitman* found the plaintiffs' interpretations of their policies unreasonable, these cases are of limited value here. They are not binding on this Court, involve different insurance policies, and concern distinct policy language about the cost of insurance. Other courts, meanwhile, have allowed cost-of-insurance claims to proceed past the pleadings stage when the plaintiffs plausibly alleged that the insurer relied on factors outside those the policy contemplated. *In re Lincoln Nat'l COI Litig.*, 269 F. Supp. 3d 622, 633 (E.D. Pa. 2017) (citing *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 470 (S.D.N.Y. 2014) ("when a universal life insurance policy states that the policyholder's COI rate is 'based on' certain pricing factors, that list of factors is exhaustive, not illustrative"); *Yue v. Conseco Life Ins. Co.*, No. 08-1506, 2011 WL 210943, at *7 (C.D. Cal. Jan. 19, 2011) (where policy specified that the COI rate would be determined based on insurer's expectation as to future mortality experience, insurer breached by considering non-enumerated factors)).

Here, the Policy does not tie the risk charge to enumerated factors that relate to mortality. Instead, it defines the risk charge as covering the risk of loss, which Marino reads as the risk the insured will die. FNWL counters that "the Policy does not state that the Risk Charge *only* pays for the risk of loss and does not otherwise define 'risk of loss.'" Dkt. No. 13 at 8 (emphasis in original). That is correct. But FNWL drafted the Policy and chose to call the charge a "Risk Charge" that pays for the risk of loss, and a reasonable purchaser could take that description at its word.

Nor does FNWL explain why—given the lack of enumerated factors or a clear definition—it's unreasonable to read the Policy as precluding other risks, or as requiring FNWL to accurately account for mortality risk in light of improving rates. Because Marino's reading is reasonable, the Court cannot reject it on a motion to dismiss. On that reading, she has plausibly alleged a breach of the Policy.

FNWL also argues that Marino's overcharge theory should be dismissed because she relies on information-and-belief allegations that mortality rates have generally improved since she bought the Policy in 1988. Marino argues that because she alleged "decades of improving mortality, . . . and the absence of downward adjustments" the Court can infer this trend in her favor. She is right. At the pleading stage, she need not provide concrete proof or reverse engineer FNWL's actuarial work. Whether mortality has in fact improved, and what any improvement should have meant for her risk charge, are factual questions for another day. The Court declines to dismiss her claim on this ground.[2]

### 4.3 Marino states a plausible claim for breach of the implied covenant of good faith and fair dealing.

"Under Washington law, the duty of good faith and fair dealing 'obligates the parties to cooperate with each other so that each may obtain the full benefit of performance.'" *Retsel*, 2026 WL 2168599, at *3 (quoting *Badgett v. Sec. State Bank,*

---

[2] Marino alleges that FNWL breached the contract both by overcharging for the cost of insurance and by underpaying interest. Because the Court finds that Marino states a contract claim on her overcharge theory, it need not address whether her underpayment theory also supports that claim. The Court expresses no view on that question, and the underpayment theory remains in the case.

807 P.2d 356, 360 (Wash. 1991)). The duty "arises when the contract gives one party discretionary authority to determine a contract term." *Rekhter*, 323 P.3d at 1041 (citation modified). It does not arise where the contract gives a party unconditional authority to determine the term. *Id.* at 1044–45. But where discretion exists, "[g]ood faith limits the authority of a party retaining discretion to interpret contract terms; it does not provide a blank check for that party to define terms however it chooses." *Scribner v. Worldcom, Inc.*, 249 F.3d 902, 910 (9th Cir. 2001).

Marino alleges that FNWL breached its duty of good faith and fair dealing by failing to increase interest rates above 4.5 percent. According to Marino, FNWL had discretion to raise interest rates, and the Policy implies that it will do so in stating that rates are "subject to change at any time" and "may" exceed the 4.5 percent minimum. In never raising interest rates, she says, FNWL abused its discretion. FNWL takes the opposite position, arguing the Policy cannot reasonably be read as promising an increase above the guaranteed minimum, and that FNWL is allowed to profit. Dkt. No. 10 at 21 (citing *Norem*, 737 F.3d at 1155 ("[N]o one would expect to be able to enter into a business contract in which the consideration covered only the cost of services rendered and nothing more.")).

FNWL is right that it may earn a profit, and nothing in this Order suggests otherwise. But the question on a Rule 12(b)(6) motion is narrower: whether Marino has pleaded facts that allow the Court to draw the reasonable inference that FNWL breached a duty of good faith. *Iqbal*, 556 U.S. at 678. The Court need not decide now how far FNWL's discretion over interest rates extends, or what good faith requires of it. It is enough that FNWL itself describes the Policy as giving it "discretion to set

the current rate, subject to a guaranteed minimum." Dkt. No. 10 at 19–20. That discretion is not unconditional. The Policy ties it to a purpose—rates FNWL "may use … to calculate interest on the accumulation account"—and reserves the right to change those rates over time. Dkt. No. 1-2 at 28. That is discretion over a contract term, not an absolute privilege to decline performance. *See Rekhter*, 323 P.3d at 1041. FNWL reads that discretion as limited only by the floor. *Id.* at 20. Marino reads it as bounded by good faith. Her reading is at least reasonable, and that is enough at this stage. *See* Dkt. No. 12 at 16.

Marino alleges, on information and belief, that FNWL credited only the guaranteed minimum for the 2023–2024 policy year even though interest earnings in 2023 materially exceeded 4.5 percent. Dkt. No. 1-2 ¶ 27. FNWL's comparison to the higher rates of 1988, Dkt. No. 10 at 20–21; Dkt. No. 13 at 13, doesn't defeat that inference. Marino does not allege that FNWL had to track any index, and whether its earnings justified a higher rate is a question of fact. Dkt. No. 12 at 17. Read in the light most favorable to Marino, these allegations state a plausible claim for breach of the implied covenant of good faith and fair dealing.[3]

The result would be the same under Illinois law, which also requires that "a party vested with contractual discretion must exercise that discretion reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable

[3] Marino alleges that FNWL breached the implied covenant both by overcharging for the cost of insurance and by underpaying interest. Because the Court finds that Marino states an implied covenant claim on her underpayment theory, it need not address whether her overcharge theory also supports that claim. The Court expresses no view on that question, and the overcharge theory remains in the case.

expectations of the parties." *Cont'l Mobile Tel. Co. v. Chi. SMSA Ltd. P'ship*, 587 N.E.2d 1169, 1174 (Ill. App. Ct. 1992); *see also Resol. Tr. Corp. v. Holtzman*, 618 N.E.2d 418, 424 (Ill. App. Ct. 1993). The only difference is where the theory lives—inside the contract claim rather than beside it. Either way, it survives this motion.

**4.4 Marino states a plausible CPA claim.**

"[T]o prevail in a private CPA action . . . , a plaintiff must establish five distinct elements: (1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). FNWL challenges only the first element, so the Court addresses only that element.

An act is deceptive if it is likely to mislead a reasonable consumer, and the inquiry turns on the "net impression" a communication creates. *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 895–96 (Wash. 2009). The Washington Supreme Court recently reiterated that whether an act is deceptive presents a mixed question of law and fact. *Greenberg v. Amazon.com, Inc.*, 553 P.3d 626, 649 (Wash. 2024).

The Policy labels one monthly deduction a "Risk Charge" and tells the policyholder that it "pays for the risk of loss," while describing a separate charge that "covers the cost of managing the policy." Dkt. No. 1-2 at 22. If, as Marino alleges, FNWL loaded the risk charge with non-mortality costs, a reasonable policyholder could be misled about what she was paying for. *Id.* ¶¶ 21–22, 31, 59.

And because Marino plausibly alleges that FNWL abused its discretion over risk rates and interest, *see supra* §§ 4.2–4.3, whether that conduct was also unfair is a fact-bound question that cannot be resolved against her now. *See Greenberg*, 553 P.3d at 649.

Finally, FNWL argues Marino's CPA claim fails as a matter of law because it depends on failed breach of contract theories. But the Court did not dismiss Marino's contract claims, and her CPA claim does not simply relabel a breach; it rests on what FNWL told policyholders the risk charge was for.

Thus, Marino has plausibly alleged an unfair or deceptive act or practice, and the Court declines to dismiss her CPA claim.

**4.5 The Court takes judicial notice of the published federal funds rates, but not of FNWL's inferences from them.**

FNWL asks the Court to take judicial notice of historical Federal Funds Effective Rates published by the Federal Reserve. Dkt. No. 9. Marino does not dispute that the Court may take notice of the published data. She objects only to FNWL's use of it to show that the 4.5 percent guarantee was "generous" relative to rates in effect since 2023. Dkt. No. 12 at 22. FNWL disclaims seeking that finding. Dkt. No. 13 at 13 n.8. Because the rates "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), the Court GRANTS the motion and takes judicial notice of the rates set out in FNWL's motion. Dkt. No. 9 at 1–2. But it does not take notice of any inference about what those rates mean for FNWL's crediting decisions.

## 5. CONCLUSION

Accordingly, the Court DENIES FNWL's motion to dismiss. Dkt. No. 10. The Court LIFTS the stay imposed at Dkt. No. 15 and will issue a new Order Regarding Initial Disclosures, Joint Status Report, and Early Settlement.

Dated this 13th day of October, 2026.

Jamal N. Whitehead
United States District Judge